PLANTERS BANK AND TRUST COMPANY v. M. J. FELTON, NORA FEL-
TON, MARTHA FELTON, T. R. FELTON, AND W. L. FELTON.

(Filed 15 October, 1924.)

### 1. Actions—Executors and Administrators—Heirs at Law.

After the administrator has duly settled the estate of his intestate, an
action may be sustained against his heirs at law upon his unpaid notes,
or a debt due by the estate.

### 2. Bills and Notes—Negotiable Instruments—Fraud—Notice.

Under the provisions of our statute, the procurement by fraud of a
negotiable note will avoid it in the hands of those who have previously
acquired with notice, which may be shown to rebut the prima facie case
made out by a holder after proving the genuineness of the instrument.

### 3. Same—Illegality—Blue-Sky Law—Banks and Banking.

Where a bank has acquired a negotiable instrument procured by fraud
and in violation of a criminal statute, in this case the Blue-Sky Law,
evidence that some of the officers of the bank had acted in selling the
notes on commission, and others thereof upon the loaning committee had
knowledge of the illegality of the corporation in soliciting the sale of the
shares of stock for which the notes were given, is sufficient to take the
case to the jury in defense of an action upon the notes.

### 4. Same—Due Course.

Where a negotiable note is given for shares of stock in a corporation,
solicited in violation of the Blue-Sky Law, the note is voidable against a
holder who has acquired it with notice of the illegality or fraud in the
procurement of the instrument.

APPEAL by defendants from *Allen, J.,* and a jury, at April Term,
1924, of WAYNE.

The plaintiff bank brought this action, and, since the suit was insti-
tuted, has been placed in the hands of a receiver, the Bank of Fremont.
The receiver bank was made a party plaintiff to the action, and the
judgment rendered was in favor of the Bank of Fremont, receiver of
the Planters Bank and Trust Company.

The suit was to recover on two notes—one for $3,000 and one for
$10,000—dated 31 December, 1919, and due at twelve months, with
interest from date, made by Thomas Felton. The notes are similar in
every respect, except the amount.

It was admitted that the notes were signed by Thomas Felton. The
notes were made payable to the order of himself, and it was contended
that he endorsed them; the said notes being for the purchase price of
stock in the Fisheries Products Company sold by agents of said com-
pany, and said notes having been sold by said agents to the plaintiff.
After the filing of the final account by the executor, and long after said
notes became due, the same having matured during the life of Thomas

Felton, the plaintiff brought suit upon said notes' against the defendants as legatees and beneficiaries under the will of the said Thomas Felton. The defendants denied the endorsement of said notes by the said Thomas Felton, and set up as a defense that said notes were illegal, under C. S., Art. 10, ch. 106, known as the "Blue-Sky Law"; that they were obtained by misrepresentation and fraud; and the defendants further contended that in any event the defendants, legatees and beneficiaries under said will, were not liable upon said notes.

The exceptions and assignments of error will not be considered *seriatim*, but the main contentions will be passed on, and the other material facts set forth in the opinion.

*Langston, Allen & Taylor, and B. F. Aycock for plaintiff.*
*S. G. Mewborn and Dickinson & Freeman for defendants.*

CLARKSON, J. The contention by the defendants that the plaintiffs should have sued M. J. Felton, executor of Thomas Felton, and not the defendants, legatees and beneficiaries under the will of Thomas Felton, cannot be sustained. The record shows, and it is not disputed, that M. J. Felton was duly appointed and qualified as executor of the last will and testament of Thomas Felton. As executor, he advertised, as required by law, and, after the expiration of the year, filed a final account with the clerk of the Superior Court and settled with the legatees and beneficiaries. The suit is allowable by statute in such cases for the debts of such decedent unpaid and the extent of liability fixed. Consolidated Statutes on the subject are as follows: Sections 45, 59, 60, 76, and 101.

The next contention is one of serious concern. It relates to negotiable instruments. The form of negotiable notes, in accordance with C. S., 2982, is as follows:

"An instrument to be negotiable must conform to the following requirements: (1) It must be in writing and signed by the maker or drawer; (2) must contain an unconditional promise or order to pay a sum certain in money; (3) must be payable on demand or at a fixed or determinable future time; (4) must be payable to the order of a specified person or to bearer; and (5) where the instrument is addressed to a drawee, he must be named or otherwise indicated therein with reasonable certainty."

C. S., 3033. "A holder in due course is a holder who has taken the instrument under the following conditions: (1) That the instrument is complete and regular upon its face; (2) that he became the holder of it before it was overdue and without notice that it has been previously dishonored, if such was the facts; (3) that he took it for good faith and

value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

C. S., 3036 defines when title defective: "The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto, by fraud, duress or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud."

C. S., 3037 defines what constitutes notice of infirmity or defect: "To constitute a notice of an infirmity in the instrument, or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect or knowledge of such facts that his action in taking the instrument amounted to bad faith."

C. S., 3040, further defines who is deemed a holder in due course: "Every holder is deemed prima facie to be a holder in due course, but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course. But the last-mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title."

A note payable to a specified person, or his order, is negotiable (C. S., 2989). If payable to order, it is negotiated by the endorsement and completed by delivery (C. S., 3010). Under the above negotiable-instrument law, when Thomas Felton made the negotiable notes sued on "payable to the order of myself," and he endorsed and delivered them, and plaintiff bank became the holder, it "is deemed prima facie to be the holder in due course." By due course is meant that the bank became the holder before maturity; that it took the notes for good faith and value and without notice of any infirmity in the instrument or defect in the title of the person negotiating it. Nothing else appearing, this entitles the holder, the plaintiff bank, to maintain an action on the notes. By presenting the notes, admitted to be signed by Thomas Felton, and proof of his endorsement (which is denied in this case), the plaintiff bank makes out a prima facie case—that is, a case sufficient to justify a verdict; but this prima facie case may be rebutted.

The defendants introduced evidence tending to show that the execution of the notes had been obtained by fraud and tainted with illegality (infirmity in the notes and defect in the title), and thereupon the burden devolved upon the plaintiff to show by the greater weight of the evidence that it acquired the notes before maturity, bona fide, for value,

without notice of any infirmity in the notes or defect in the title (fraud or illegality) of the party negotiating them—the Fisheries Products Company. Such notice on the part of the plaintiff means either actual knowledge of the infirmity or defect, or knowledge of such facts that its action in taking the notes amounted to bad faith. *Holleman v. Trust Co.,* 185 N. C., p. 49.

In construing section 3040, *supra,* in *Bank v. Sherron,* 186 N. C., p. 299, citing many cases, it is said: "There are numerous cases which hold: 'Upon proof of fraud or illegality being offered, burden is shifted to holder, and he must show that he received the instrument bona fide and for value.' "

In *Steel Co. v. Ford,* 173 N. C., p. 196, it was said: "The law presumes that the holder of a note endorsed in blank is its holder in due course; that he took it for value before maturity and without notice of any equity; that he is the owner and has the right to bring suit to enforce collection."

Is there any competent evidence in this case to be submitted to the jury to rebut this presumption, or statutory declaration that the plaintiff bank is deemed prima facie to be a holder in due course?

The evidence was that in the community where the plaintiff bank did business there were men selling stock for the Fisheries Products Company. B. C. Scott was cashier of the plaintiff bank. He testified, on cross-examination: "I don't know how long I had known these stock sales agents, but I had known them for some time, and they had been in the bank before, and talked with me about handling the notes."

"Q. You had made arrangements with them? A. I didn't make any arrangements with them at all to handle a paper like that. It had to be approved by the 'finance committee.' These agents came in there to see if the bank would handle them."

J. L. Hare, a director of the bank and a member of the finance committee of the bank, testified, on cross-examination:

"Q. I will ask you if you didn't know that these particular notes were stock notes, given for stock and offered to the bank as coming from a stock salesman? A. I imagine so.

"Q. Do you know whether those other notes which he paid were also given for Fisheries Products stock? A. The same notes, I thought—the same concern."

The notes given by Thomas Felton, when taken by the plaintiff bank, were not paid for in money, but certificates of deposit given the sales agent, and these certificates of deposit of the bank fell due the same day that Felton's notes fell due—twelve months off, or on 1 January, 1921. Three certificates, amounting to some $25,000, were given the sales agent and included the Felton notes and other notes of the Fisheries

Products Company bought of the sales agent. The sales agent left $4,500 on deposit in the bank at the time he negotiated the notes, and took certificates of deposit. The bank certificates were given without interest. Notes sold the bank bore interest from date. The bank officials knew Felton. Hare testified: "He was very old." Hare knew Felton and investigated his worth, looking towards the bank purchasing the notes. He went to Wilson County—the same county Felton lived in. He knew Felton, but never saw him or informed him about the contemplated purchase. E. G. Deans, who became cashier later of plaintiff bank, testified: "When these certificates became due they were in the possession of the Fisheries Products Company." There was evidence tending to show that plaintiff bank took the notes in due course and had no actual knowledge of any infirmity or defect or knowledge of such facts as its action in taking the notes amounted to bad faith.

We think the defendants' exceptions and assignments of error on this aspect of the case should be sustained. We think, under the facts and circumstances of this case, there was some evidence to have been submitted to the jury.

In *Oil Co. v. Hunt,* 187 N. C., p. 159, it was said: "The presence of fraud, when resorted to by an adroit and crafty person, is at times exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote it. Under such conditions, the inferences legitimately deducible from all the surrounding circumstances furnish, in the absence of direct evidence, and often in the teeth of positive testimony to the contrary, ample ground for concluding that fraud has been resorted to and practiced by one or more of the parties. *Grove v. Spike,* 72 Md., 300."

The defendants contend that the notes in the hands of the plaintiff bank, if the jury should find it was not a holder in due course, a bona fide holder for value, before maturity, without notice, are subject to all the equities and defenses that Thomas Felton had against the Fisheries Products Company. The notes fell due 1 January, 1921, and Felton died 6 January, 1921, and the defendants succeeded to his rights and are entitled to set up the equities and defenses:

"(1) That the notes were obtained by misrepresentation and fraud.

"(2) That the notes were illegal, under the 'Blue-Sky Law.' "

From the entire record, there was sufficient competent evidence, circumstantial and otherwise, to go to the jury to show that L. G. Layton, who actually negotiated the notes to the bank, and Abbott & Bradley, were agents of the Fisheries Products Company.

The defendants offered to prove by M. J. Felton, a son of Thomas Felton, and who lived with him at the time of the Fisheries Products Company stock sale to his father, the following: "That on 31 December,

1919, Abbott and Bradley, two stock sales agents, selling stock in the Fisheries Products Company, went to the home of Thomas Felton for the purpose of selling him stock in this company, and that as an inducement to purchase said stock they represented to the said Thomas Felton and promised him that he would never have to pay a cent for said stock, except from dividends from the stock, and that said dividends would fully take care of and pay off said purchase price of the stock." The testimony offered was objected to by plaintiff, and was excluded, and defendants excepted and assigned error. We think the evidence competent and should have been allowed.

In *Des Farges v. Pugh,* 93 N. C., p. 36, it was said: "The intent is always a question for the jury, and to determine whether the intent was fraudulent the jury have necessarily to look to the circumstances connected with the transaction or those immediately preceding or following it." *Whitehurst v. Ins. Co.,* 149 N. C., p. 276; *Bank v. Yelverton,* 185 N. C., p. 314.

The defense sets up the "Blue-Sky Law" as applicable. This has been done in many cases by leading attorneys of much learning over the State, but this Court has not heretofore construed the legislative enactments on the subject in any civil action.

The matter is so vital to the people of the State, we give the material statutes applicable in full:

C. S., 6363, amended by Public Laws 1923, ch. 161, reads as follows: "Before any bond, investment, dividend, guarantee, registry, title guarantee, debenture, or other like company (not strictly an insurance company as defined in this chapter), or any individual, corporation, or partnership who, by agents, offers for sale or sells the stocks, bonds, securities, or obligations of any foreign corporation, whether organized or to be organized or being promoted, may be authorized to do business in this State, such company, individual, or partnership must be licensed by the Insurance Commissioner; and the Commissioner is authorized to issue such license when he is satisfied that such company or corporation is safe and solvent, and has complied with the laws of this State applicable to fidelity companies and governing their admission and supervision by the Insurance Department. The term 'security' or 'securities' shall include any note, stock, treasury stock, bond, debenture, evidence of indebtedness, transferable certificate of interest or participation, certificate of interest in a profit sharing agreement, certificate of interest in an oil, gas, or mining lease, collateral trust certificate, any transferable share, investment contract, or beneficial interest in or title to property or profits, or any other instrument commonly known as a security. If such company is chartered and organized in this State and has its home office within the State, and is solvent to the extent of at

least fifteen thousand dollars, it may, if a stock company, commence business with a capital stock of twenty-five thousand dollars. The license issued to such companies and their agents shall be issued and paid for as provided for those of insurance companies. This section shall also apply to every corporation, company, copartnership, or association organized or to be organized in this State where such company or organization by its organizers or promoters puts or proposes to put the stock of the company on the market in person or by agents."

C. S., 6367, amended by Public Laws 1923, ch. 180 (second section of this law repealed at Special Session, 1924), is as follows: "No person for the purpose of organizing or promoting any company, or promoting the sale of securities of such company by it after organization, as principal or agent, shall sell or agree or attempt to sell within this State any securities of such company unless the contract of subscription or of sale shall be in writing and contain a provision in the following language: 'No sum shall be used for commission, promotion, and organization expenses on account of any share of stock in this company in excess of twelve and one-half per centum (before the Act of 1923, one per centum allowed, or $1.00 a share, etc.) of the amount actually paid upon separate subscriptions, for such securities, and the remainder of such securities shall be held or invested as authorized by the law governing such company and held by the organizers (or trustees as the case may be), and the directors and officers of such company after organization, as bailee for the subscriber, to be used only in the conduct of the business of such company after having been licensed and authorized therefor by proper authority."

The punishment for violation is two-fold; revocation of license and making the officer or agent guilty of a crime.

C. S., 6374. "No company shall fail to comply with any provision of the law or any requirement of the insurance commissioner pursuant to the law, and no officer, agent, or employee of any such company shall make or cause to be made any false statement in any report required by him, or a false entry in any book of such company, or shall make or publish any false statement of its condition or regarding its securities; and upon any violation of this section the insurance commissioner may revoke its license to do business in this State."

C. S. 6375. "Any officer or agent of such company knowingly or wilfully violating any of the provisions of this article shall be punished by a fine not exceeding two hundred dollars, or by imprisonment in jail or worked on the roads for not exceeding two years, or by both such fine and imprisonment."

In *S. v. Agey,* 171 N. C., p. 831, the statutes now under consideration were construed in a criminal action as applying to a foreign corporation.

Agey, an agent of a foreign corporation, organizer and promoter of a "Fig Orchard" scheme, without complying with the statutes of this State and obtaining license, came into the State to do business. He was convicted and on appeal this Court found no error. The Court said: "The intent of the statute is to protect our people, under the police power, from fraud and imposition by irresponsible nonresident parties." The same principle applies to domestic corporations and parties.

The defendants offered to prove that there was no written contract of subscription or of sale, showing compliance with C. S., 6367, *supra.* This was excluded by the court below, to which exception and assignment of error was made. We think this was error, and the evidence competent.

The legislative enactment above referred to prohibits any individual, corporation or partnership, who by agents offers for sale or sells the stocks, bonds, securities or obligations of any foreign corporation, whether organized or to be organized or being promoted, before business can be done in the State license is required. This also applies to every corporation, company, copartnership, or association organized or to be organized in this State where such company or organization by its organizers or promoters puts or proposes to put the stock of the company on the market in person or by agent.

These *organizers and promoters* who sell stock in person or by agents must obtain license. If they do not obtain license, they are guilty of a criminal offense. If they obtain license and sell stock they must put the contract of subscription or sale in writing with the provision in it in the language of the statute. If this is not done, it is made a criminal offense. The purpose and intent of the act is to prohibit organizers and promoters, whether foreign or domestic, who organize and promote the sale of what is commonly known as "blue-sky stock," from doing business without complying with the statutes. The further purpose and intent of the act was to guard and protect an unsuspecting and trusting public from what are commonly known as "wild cat" organizers and promoters and their agents. Now the question arises if these provisions are not complied with, is a note given for stock enforceable in the courts of this State? We think not as between the parties. The courts would not lend their aid to enforce the collection of a note between the parties given without complying with the statute and which makes the officer or agent who violates this provision of the act guilty of a crime. It would be contrary to public policy. The transaction is illegal—voidable, not void.

If, however, the note was negotiated and purchased in due course without notice, bona fide for value and before maturity, it would be enforceable in the hands of an innocent holder. If a statute in clear language declares a note given in violation of its provisions void, it is

not enforceable even if it is a negotiable note transferred in due course without notice to a bona fide purchaser for value, before maturity. It is like a stolen horse, no title passed to any purchaser, however innocent he may be.

We think the position and distinction here taken is borne out by the authorities in this State and elsewhere. *Calvert v. Williams,* 64 N. C., 168; *Glenn v. Bank,* 70 N. C., 191; *Ward v. Sugg,* 113 N. C., 489; *Randolph v. Heath,* 171 N. C., 383; *Bank v. Grafton,* 181 N. C., 404; *Miller v. Howell,* 184 N. C., 119.

In *Glenn v. Bank, supra,* p. 206, the principle is succinctly stated thus: "The rule to be extracted from the decisions we consider to be this: If a statute declares a security void, it is void in whosesoever hands it may come. If however a negotiable security be founded on an illegal consideration, (and it is immaterial whether it be illegal at common law or by statute), and no statute says it shall be void, the security is good in the hands of an innocent holder, or of any one claiming through such a holder."

In *Ward v. Sugg, supra,* at p. 494, it is said: "There is a broad distinction which runs through all the cases everywhere between contracts upon an illegal consideration as to which, the parties being in *pari delicto,* the courts will aid neither party, but will protect the note in the hands of a holder for value without notice, and a contract which, in whole or in part, is declared void or forfeited in its inception which can acquire no validity by being passed on to other hands."

It may be noted that these last two decisions were rendered before the Negotiable Instrument Act of 1899. We do not think the act changes in the least this important distinction in regard to negotiable papers at common law, but is in affirmance thereof.

"The principle to be extracted from all the cases is that the law will not lend its support to a claim founded upon its violation. *Kelly v. Courier,* 1 Okla., 277." *Vinegar Co. v. Hawn,* 149 N. C., p. 357.

From the view we take, there must be a

New trial.