JESSIE D. CATES CLARK AND JOHN M. CLARK, HER HUSBAND, V. LAUREL PARK ESTATES, INC., STRADLEY MOUNTAIN DEVELOPMENT CORPORATION, AND CENTRAL BANK AND TRUST COMPANY, TRUSTEE.

(Filed 13 February, 1929.)

1. **Trial—Instructions—Construction.**

Under the rule that a charge of the court to the jury will be construed contextually as a whole, unconnected excerpts from the charge appearing of record as exceptions is not sufficient.

2. **Cancellation and Rescission of Instruments—Right of Action and Defenses—Fraud—Deeds.**

When a land development company has platted a large area of land to be sold into lots, and represents that it has money in the bank to pay for street and other improvements, including the erection of a fine hotel, and relying on these representations and induced thereby one has purchased a lot of the land so situated as to be more largely benefited in regard to its location near the hotel, under written assurance from the owner that

CLARK v. LAUREL PARK ESTATES.

he as a representative of the company would sell the lot at a profit so as to save the purchaser harmless: *Held*, the failure of the company to fulfill these material promises is sufficient evidence of the fraudulent intent of the promisor to be submitted to the jury and to sustain their verdict for rescission of the contract, and the purchaser may recover the moneys he has paid in the transaction.

**3. Election of Remedies—Affirmance of Contract by Acting Thereunder—Notice of Fraud—Deeds.**

A purchaser of a lot in a scheme for the development of a large tract of land is put to his election to rescind the contract for fraud within a reasonable length of time after the discovery of fraud, or to affirm it by accepting its benefits and by making payment on the purchase price and paying interest when it becomes due, but it is not alone a sufficient affirmance of the contract under circumstances wherein it will appear that this was done without knowledge, actual or constructive, of the fraud practiced upon him.

**4. Cancellation or Rescission of Instruments—Right of Action and Defenses—Right to Rescission in General.**

In order for the plaintiff to be entitled to the equitable relief of rescission of a contract for fraud he must be in a position to put the parties in *statu quo* by restoring the benefits received thereunder.

**5. Bills and Notes—Actions—Evidence and Burden of Proof of Acquisition as Bona Fide Purchaser Without Notice.**

Where a negotiable note is in the hands of a holder properly endorsed to him it is prima facie evidence that he is holder in due course without notice of any infirmity in the instrument, subject to rebuttal, but where there is evidence of fraud in its procurement, the burden is upon such holder to prove that he had acquired the instrument as a bona fide purchaser in due course and without notice, and on conflicting evidence the fact is for the jury to determine.

**6. Same—Evidence of Knowledge of Fraud.**

Where there is evidence that a trustee in a deed of trust of lands in a development scheme held for the benefit of the owners of the land by the recitations in the deed of trust and other conveyances relating to the sales, and by the declaration of the trust officer of the trustee corporation, and evidence *per contra* that the property was held in trust for bondholders having money in the development company, and the trustee knew, or by reasonable inquiry should have known, of fraud practiced in the sale of the lots by the development company, and has in its provisions the notes secured by mortgage endorsed to it by the development company, the question of its being a holder in due course is one for the jury.

*Held*, the evidence that the holder of the negotiable instruments in this case had knowledge of the fact that the same were procured by fraud or had knowledge of facts which should have put him on reasonable inquiry which would have discovered the fraud is sufficient to be submitted to the jury.

APPEAL by defendant, Central Bank and Trust Company, trustee, from *Sink, Special Judge,* and a jury, at May Special Term, 1928, of BUNCOMBE. No error.

40—196

CLARK *v.* LAUREL PARK ESTATES.

This is an action brought (1) against defendant, Laurel Park Estates, Inc., for actionable fraud and rescission for judgment for the money paid it—$1,250 purchase price and $112.50 interest—by plaintiff, Jessie D. Cates Clark; (2) against Central Bank and Trust Company, trustee, that held certain negotiable notes involved in the transaction be canceled. The controversy was over the purchase of a lot from Laurel Park Estates, Inc., for $5,000 on 28 June, 1926. The sum of $1,250 was paid in cash and three notes of $1,250 each, due in 12, 18 and 24 months, given for the balance. The Central Bank and Trust Company, trustee, denied any knowledge of fraud and set up the defense (1) That said Laurel Park Estates, Inc., duly endorsed, transferred and delivered to the defendant, Central Bank and Trust Company, as trustee, for value, and before maturity, the said three notes and the said defendant, Central Bank and Trust Company, as trustee, is now the bona fide holder of said notes. (2) That, in recognition of the validity of said three notes, and of the fact that the same were held by said Central Bank and Trust Company, as trustee, plaintiffs, on 29 December, 1926, paid to defendant, Central Bank and Trust Company, the semiannual interest which was due and payable on said three notes on 28 December, 1926. (3) That plaintiffs failed and refused to pay the semiannual interest which became due and payable on said three notes on 28 June, 1927, and also failed and refused to pay the said note which became due and payable on 28 June, 1927, and defendant, Central Bank and Trust Company, as trustee, has, therefore, pursuant to the terms of said notes, declared the full amount of the principal and interest of all of said notes due and payable and thereby, plaintiffs became indebted to the said defendant, Central Bank and Trust Company, as trustee, in the sum of $3,750, with interest thereon from 28 December, 1926, no part of which has been paid, and all of which is now justly due and owing, and demands judgment against plaintiffs for the amount and interest.

Defendant, Central Bank and Trust Company, trustee, contended that said three notes executed by the plaintiffs were delivered to it immediately after they were executed by plaintiffs, in consideration of Central Bank and Trust Company, as trustee, executing and delivering a release deed, releasing the lot purchased by plaintiffs from the lien of two deeds of trust securing indebtedness aggregating in principal amount $700,000, and that it held said notes as trustee as security for the payment of said bonds and notes secured by said deed of trust aggregating in principal amount $700,000. The defendant, Laurel Park Estates, Inc., filed no answer.

Jessie D. Cates Clark and her husband, John M. Clark, live in Maryville, Tenn. Two sales agents of the Laurel Park Estates, Inc., in June,

CLARK v. LAUREL PARK ESTATES.

1926, had plaintiffs to visit Asheville. They came in a public taxi and their expenses were paid by the agents. They were met at Kenilworth Inn by another agent. John M. Clark testified in part: "He entertained us, stayed with us, took us to places of amusement. Afterwards he took us back to the hotel and we were assigned rooms. Next morning he came and guided us out to Stradley Mountain and showed us the Stradley Mountain property. While we were out there *they gathered the parties together and on top of the mountain* had a lecture delivered by another agent. This agent said this property was being developed and that *he had been all over the world,* and that this was *the most beautiful spot* he had ever seen for a development. He then described what the developments were to be, the paving of the streets, putting in water, lights, telephones, sewers, building of a hotel, building of a golf course, a clubhouse, schoolhouse, and certain portions were to have business properties on them. The business section was down near the roadway leading past the property. Electric lights, golf course, and hotel were promised. He said the hotel was under contract and would be there by the first of the year following. It was to cost a million dollars or more. He said the money for these improvements was in the Central Bank and Trust Company, of Asheville. While we were on the mountain they had a band concert and this lecture and a luncheon. Several announcements were made from a megaphone down below from their little office, saying 'Sold.' This was done several times. The date of this was 17 and 18 of June. The agent that met us at Kenilworth Inn attended us first, then turned us over to Harry W. Hoff, general director of sales. I saw him on the ground and talked to him. . . . He was director of sales for Laurel Park Estates, Inc., according to his statement. I saw him direct the sales. He reiterated the claims that the lecturer had stated. He insisted on my wife buying a certain lot, and told of the money that was in the bank to do all these improvements, and insisted on the safety of the investment, but we were not impressed with all this so much until he said, 'To be sure that your money is safe, I will guarantee to refund it or resell it at a profit.' I have the original sales contract. I saw him sign it on the back that day. I saw Mr. Harry W. Hoff write on the back of the contract. It was written at the little office on the mountain."

The following was signed by Hoff: "This property is sold with the specific agreement that we will resell same (if requested by the buyer) at a profit, prior to date when next payment comes due, or refund purchase price with interest at 6% and cancel the sale. Harry W. Hoff, general director sales, Stradley Mountain Park."

John M. Clark further testified: "This little house where this was written is the same place the megaphone calls came up 'Sold.' Mr. Hoff

gave me a plat when we closed the sale. He had the red ink mark put on lot 7, on the plat, the one we purchased. The name of the hotel that was to be erected on top of the mountain was Lafayette Chateau. . . . Mr. Hoff and the other agent that met us at Kenilworth Inn pointed out just where the hotel was to be built on top. The hotel was to be on the crest of the mountain. The lot, No. 7, was in the block below, about three or four hundred feet from the hotel site. With reference to the little house where the megaphone calls came from, about this point (pointing). After we signed the contract to purchase the lot we were brought back to Kenilworth Inn; the taxi was waiting and we left immediately for Maryville. The notes we signed were mailed us from the office of Laurel Park Estates, Inc. Before we left we paid to Mr. Hoff at the office on the ground $1,250, by check. We signed the notes that were sent us by mail because of the contract and because of the representations that were made by the agent. The agents stayed with us all the time we were here, except when we were in our rooms. I wouldn't have signed the notes had it not been for the representations about the hotel and improvements and what they were going to do and the money on deposit to do it with because I wouldn't have thought it would have been value received. This took place in June, 1926. I went out there about last Thursday and I did not find a hotel and paved streets and improvements, but I found conditions very much worse than they were when we were there. Streets that had been graded were washed into gulleys now. The land next to the road is open fields; further on up the mountain there is scrubby pine, and at the top a little cleared place. The fields and forests are in about the same condition as when we were there before. The roads haven't been paved. The music, the lecturer, and pavilion are not there now. The writing that had been handed me came to my wife through the mail some time the latter part of June, 1926, or July."

Plaintiffs introduced in evidence a warranty deed from Laurel Park Estates, Inc., to Mrs. Jessie D. Cates Clark (wife of John M. Clark), of Maryville, State of Tennessee, covering the property purchased by the plaintiff and recorded in Book 350, at p. 64.

Plaintiffs also introduced in evidence a deed of release from the Central Bank and Trust Company, trustee, to Mrs. Jessie D. Cates Clark, releasing the lot purchased by her. The release recites (1) a deed in trust from Stradley Mountains, Inc., dated 1 March, 1926, duly registered to Central Bank and Trust Company, trustee, to secure certain indebtedness (2) on the same date a deed from Stradley Mountains, Inc., certain land including the lot in controversy to defendant Laurel Park Estates, Inc., (3) on the same date, deed in trust from Laurel

Park Estates, Inc., to Central Bank and Trust Company, trustee, certain lands, including the lot in controversy duly registered.

While on *top of Stradley Mountains,* the agent handed plaintiffs a circular which in part is as follows:

*"Stradley Mountain Park* is marked for success. Its location, accessible and yet removed, is the obvious site for a community of homes. Its appeal is instantaneous and lasting; its beauty inspires a longing for a home in the sunlit slopes. Sunshine is desirable in the selection of one's home site, but sewage disposal is more important. A complete sanitary system will be a part of Stradley Mountain Park. Water will be brought from the Mt. Pisgah watershed. Hard-surfaced roads, street lights and underground wiring for telephone and electric connections are being installed. A Donald Ross golf course, clubhouse and other conveniences will make Stradley Mountain Park a complete suburb.

*"Stradley Mountain Park* is presented by developers proud of its natural beauty, definitely assuring improvements in keeping and intent on giving to Asheville the outstanding residential suburb of Western North Carolina, a suburb in which the freedom of the country shall be blended adroitly with the convenience of the city.

*"Stradley Mountain Park* is truly 'overlooking Asheville. Tree-clad slopes command an incomparable view of the plateau. Beyond, the mountains fade into the heaven's blue; below, the bright city which is Asheville lies cool and clear. And a black ribbon of asphalt slips through grassy hills from the foot of Stradley Mountain to the city fifteen minutes away.'

*"Purchasers in Stradley Mountain Park* acquire more than a plot of land; they become shareholders in the prosperity of Asheville, privileged dwellers where climate, sun and scenery pay dividends in added years, greater health and increased happiness. Country clubs, horseback trails, fine motor roads, trout streams, and the camp grounds of Pisgah National Forest are bringing about a keener appreciation of Western North Carolina's claim of 'The Nation's Playground.' Recreation plays an enormous part in modern life. And Asheville is recreation freely offered, but in close harmony with industrial opportunity. Stradley Mountain Park is this and more—a quiet detachment from the noise of the city."

The witness further testified: "At the time the interest was paid on the notes in December, the first interest, I knew that the improvements had not been made, but did not know definitely that they were not going to be made. My wife paid about $112.50 interest in December to the Central Bank and Trust Company. Before I started this suit I demanded a refund of this interest. I made investigation to see if the money is now on deposit with the Central Bank and Trust Company,

for the purpose of making the improvements. Mr. Barnard, of the Central Bank and Trust Company, stated that the money that was there is not there. My understanding is there is no money on deposit there for this purpose. I have offered to reconvey this property to Laurel Park Estates, Inc., and they refused to accept a deed and pay me the money. . . . We went to the grounds the morning after we arrived here. They were having a band concert and a lecture. I listened to the lecture. I executed three notes along with my wife. . . . I had a conversation with Mr. C. W. Brown, trust officer of the Central Bank and Trust Company with reference to how he held these notes. He told me he held them in trust for the Laurel Park Estates, Inc., and Stradley Mountain Development Corporation. I made inquiry from the trust officer as to the $215,000 and what was done with it. I first asked Mr. Brown and he said it was still in the bank—a portion of it. Some of it had been spent out there at the time of our purchase. The remainder was in the bank. Later I asked Mr. Barnard about it, and he said that they had applied it on the notes—on the bonds, the first mortgage bonds. He didn't say he had any left for improvements."

The attorney who fixed the papers wrote to plaintiff, Mrs. Jessie D. Cates Clark: "As attorney for the Laurel Park Estates, Inc., owners and developers of Stradley Mountain Park, I am herewith enclosing deed of trust and notes covering the lot which you purchased in Stradley Mountain Park. . . . If, however, you do not wish to forward the deed of trust and notes to me, mail the same to the trust department of the Central Bank and Trust Company, and sign the enclosed letter addressed to that officer, and the deed will be placed there for delivery to you upon receipt of the notes and deed of trust properly signed and executed."

Mrs. Jessie D. Cates Clark testified in part: "My husband and I brought this case jointly. After my husband and I came to Asheville we saw the agent. He was representing the Laurel Park Estates, Inc. He took charge of us entirely. The night we came he took us to a band concert on the Plaza. Next morning he took charge of us and started to Stradley Mountain, Laurel Park Estates, Inc. He took us to the crest and we heard a lecture. He told us of his travels; that he had been everywhere in the world, and that this was the most wonderful sight he had ever seen, and told us of the wonderful improvements that were to be made there. He said on the crest was to be a hotel called Lafayette Chateau, which would cost about a million or two million, then of the streets being paved and the sidewalks and the lights and water, and everything was to be underground which could be put underground, and then of lakes and parks and things of that kind. There was to be a golf course and all those things that go to make a beautiful place. The contract was

to be let and the hotel constructed by the first of the year. The money was all ready in the Central Bank and Trust Company. After the lecture we heard the words 'Lot Sold' megaphoned from a little house below. It seemed they were selling lots fast. He took us on down after that—down around the same driveway and right in front of the only two lots he said were available there. He went and got Mr. Hoff, and he came and told us of all the wonderful improvements that were to be made there. Just above the roadway was the crest where the Chateau should stand, then just below that was my lot, and they made it very plain that it was quite an advantage to be so near the handsome hotel. Mr. Fout loaned me the money to pay for the lot. The cash payment was $1,250. I signed the notes and deed of trust and bought this property because of Mr. Hoff's alluring portrayal of the wonders that were to be made there. I would not have bought the property had those representations not been made. I went out there the other day to see if the improvements had been carried out. There is no paving there, and it is just a waste place grown up with scrubby pines. There are no telephone lines—not a thing in the world. The deed was mailed to me by Mr. Walton. There was a letter from Mr. Walton that accompanied the deed. . . . We requested Laurel Park Estates, Inc., to resell the property for us. They have not sold it. We have offered to reconvey the property to them and demanded our money and interest back. I paid $112.50 interest in December. At that time I did not know that they did not have the money in the bank for these improvements. I am willing to convey this property back, if ordered. This circular was handed to me and my husband. I believed the things that appeared to be on there and the representations as to what they would do. If I had known they did not have the money to complete the improvements, and that the property would not be improved, I would not have purchased the property."

One of the agents of the Laurel Park Estates, Inc., C. J. Brown, who lived in Maryville and brought plaintiffs to Asheville, corroborated plaintiffs, and further testified: "The lecturer said it was the greatest location, one of the prettiest places he had ever seen, would be one of the finest resorts, and that all of these things were absolutely guaranteed. Joe Hanson and Hoff, sales managers of the Stradley Mountain Development Company, Inc., or Laurel Park Estates, Inc., told me that Laurel Park Estates, Inc., had taken over the Stradley Mountain business."

The trust deed made to defendant Central Bank and Trust Company, trustee, in which the lot in controversy was included, which said trust released to Mrs. Clark contained this provision: "Before releasing any of

said real estate, however, the trustee shall require the party of the first part to file with it a certificate, duly signed and verified by one of its officers, stating that it is not in ·default in the performance of any of the terms and covenants of this indenture, and that it has sold the property so to be released for a consideration representing, in the opinion of the signer of such certificate, its full value to the party of the first part, which consideration may be (1) cash, or (2) partly cash and partly obligations secured by purchase-money mortgage or deed of trust to Central Bank and Trust Company, as trustee, upon the property so sold and to be released."

By the terms of the trust the bank was authorized to release lots therefrom upon being paid "50% of the purchase price of the property so sold, provided in no event should the amount paid for each release be less than a sum equal to $1,000 per acre." By the terms of the trust it was further required that to obtain release of lots or fractions of an acre that there should be a payment made "at the rate of $1,000 per acre." C. W. Brown was the principal trust officer of the defendant, Central Bank and Trust Company; Bascom Barnard was its associate trust officer. Mr. Barnard testified in the case that the release of the lot to Mrs. Clark was handled by Mr. C. W. Brown. Mr. Brown testified: "I don't remember the particular notes involved in this suit."

The plaintiffs introduced the deed of release of lot No. 7 by Central Bank and Trust Company, which contained the following clause: "Now, therefore, in consideration of a sum of money sufficient under the terms of each of said deeds of trust to entitle the said party of the second part to a release of the land hereinafter described from the lien and effect of said deed of trust." The land in controversy was about eight miles from Asheville.

Upon objection of the attorneys for the defendants, Central Bank and Trust Company, and Stradley Mountain Development Corporation, the court ruled that the testimony of witnesses as to statements made by the agents while the witnesses, Mr. and Mrs. Clark, plaintiffs in this action, were in Asheville, was not competent as to the two defendants, Central Bank and Trust Company, trustee, and Stradley Mountain Development Corporation, and would not be considered as to these defendants, but that it was competent only as to the defendant, Laurel Park Estates, Inc., who had not answered and whose case was before the court on default and inquiry. The same ruling was applied to the testimony of C. J. Brown.

The court below instructed the jury: "The court instructs the jury that the defendant, Laurel Park Estates, Inc., not having answered, and from the evidence introduced, if the jury believe the same, under the definition of fraud and instructions later to be given, will answer the

first issue Yes, and the second issue $1,250, and interest from the date of payment." Defendant, Central Bank and Trust Company, trustee, excepted and assigned error.

The defendant, Central Bank and Trust Company, trustee, tendered the following prayer for instruction: "Defendant, Central Bank and Trust Company (trustee), requests the court to instruct the jury that if they find the facts to be as shown by the evidence introduced, and the testimony of the witnesses, they shall answer the third issue 'Yes,' and the fourth issue 'Three thousand, seven hundred and fifty dollars, with interest thereon from 28 December, 1926.'" The court below refused to give the instruction, defendant, Central Bank and Trust Company, trustee, excepted and assigned error.

The issues submitted to the jury and their answers thereto were as follows:

"1. Were plaintiffs induced to execute the notes described in the complaint by fraudulent representations of Laurel Park Estates, Inc.? Answer: Yes.

2. If so, what amount are plaintiffs entitled to recover from defendant, Laurel Park Estates, Inc.? Answer: $1,250 and interest.

3. Did the defendant, Central Bank and Trust Company, as trustee, acquire the notes described in the answer and counterclaim of said defendant before maturity and in good faith and for value without notice of any infirmity in the notes or defects in title of Laurel Park Estates, Inc.? Answer: No.

4. What amount, if any, are the plaintiffs indebted to defendant, Central Bank and Trust Company, as trustee? Answer: Nothing."

Other material evidence will be set forth in the opinion.

*George M. Pritchard for plaintiff.*
*Bernard & Heazel for defendant, Central Bank and Trust Company, trustee.*

CLARKSON, J. This is an action for rescission, the plaintiffs alleging actionable fraud.

The record discloses that none of the exceptions and assignments of error except those above set forth is in accordance with the rules of this Court. The exceptions to the charge should be made as pointed out in *Rawls v. Lupton,* 193 N. C., p. 428, at p. 432. It is there said: "Continuity of the charge is necessary with the 'specific' exceptions. Anything else is unfair to the trial judge—to have his charge cut up in piecemeal and disconnected."

The defendant, Laurel Park Estates, Inc., filed no answer to the complaint that set forth actionable fraud. Plaintiff, Mrs. Clark, purchased

the lot in controversy for $5,000, paid one-fourth cash and gave three negotiable notes for the balance, $1,250 each, due 12, 18 and 24 months, to Laurel Park Estates, Inc., or order. The Central Bank and Trust Company, as trustee, set up the defense that "Said Laurel Park Estates, Inc., duly endorsed, transferred and delivered to the defendant, Central Bank and Trust Company, as trustee, for value, and before maturity, the said three notes and the said defendant, Central Bank and Trust Company, as trustee, is now the bona fide holder of said notes," and demanded judgment against the plaintiffs for the amount and interest.

The court below charged the jury, to which the Central Bank and Trust Company, trustee, excepted and assigned error: "The court instructs the jury that the defendant, Laurel Park Estates, Inc., not having answered, and from the evidence introduced, if the jury believe the same, under the definition of fraud and instructions later to be given, will answer the first issue Yes, and the second issue $1,250, and interest from the date of payment." This instruction says *"under the definition of fraud and instructions later to be given."*

In *Nichols v. Fibre Co.,* 190 N. C., at p. 6, it is said: "Defendant further assigns as error the failure of the court in the charge to the jury to comply with the requirements of C. S., 564. This statute makes it the duty of the judge presiding at a trial, in which issues are submitted to the jury, 'to state in a plain and correct manner the evidence given in the case and to declare and explain the law arising thereon.' " *Wilson v. Wilson,* 190 N. C., 819. There is no assignment of error, as in the *Nichols case,* that the court below did not comply with the requirements of C. S., 564.

If it be conceded that the Central Bank and Trust Company, trustee, could take advantage of this, if the exception to the charge was properly made, yet on this record from all the evidence we could not hold that this was reversible error. *Proctor v. Fertilizer Co.,* 189 N. C., 243.

"Fraud, it has been said, assumes so many different hues and forms that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily on the conscience and judgment of the court or jury in determining its presence or absence." 51 A. L. R., p. 47; *McNair v. Finance Co.,* 191 N. C., at p. 716.

The record discloses a charge of actionable fraud, so cunning, subtle and shrewd, that defendant, Laurel Park Estates, Inc., made no answer and allowed the action against it to go by default.

The evidence was plenary to establish the fraud as alleged practiced on unwary victims:

> " 'Will you walk into my parlour,' said the spider to a fly;
> "Tis the prettiest little parlour that ever you did spy.' "

The agents of the Laurel Park Estates, Inc., set the web—they brought plaintiffs from their home in Maryville, Tenn., took them to Kenilworth Inn and places of amusement and paid their expenses. Then took them to the top of Stradley Mountain, some eight miles from Asheville, N. C. A lecture was delivered by an agent, who said he had been *all over the world,* and this was the *most beautiful spot* he had ever seen for a development. Then he described what the development was to have. Hard-surfaced roads, paved streets and sidewalks, water, electric lights, telephones, sewers, golf course, clubhouse, schoolhouse, a business section, etc. A hotel at a cost of a million or two dollars under contract to be erected on top of the mountain by the first of the year, to be called· "Lafayette Chateau," underground wiring for electric lights and telephone connections, lakes, parks and those things which make "a beautiful place." The water to be brought from Mount Pisgah watershed. That the money for these improvements was in the Central Bank and Trust Company in Asheville. They had a band concert and luncheon. From the office a megaphone was repeatedly saying "Sold." "It seemed as if they were selling lots fast." The agent guaranteed to refund to the purchasers or resell at a profit. Plaintiffs' evidence was to the effect that this was not complied with. The subtle tempter was there and the lady plaintiff, with her husband standing by "She took of the fruit thereof and did eat." The plat was ready. *"He had the red ink mark put on lot 7 on the plat."* It was near the imaginary Chateau. She *borrowed* the money to pay for the lot. She signed the notes and deed of trust and bought this property because of the agent's "alluring portrayal" of the *wonders* to be made there. Later she went back to the place, portrayed almost perhaps as beautiful as the Garden of Eden: "I went out there the other day to see if the improvements had been carried out. There is no paving there and it is just a waste place, grown up with scrubby pines. There are no telephone lines—*not anything in the world."* It turned out to be a "fool's paradise." It was in evidence that there was no money in the Central Bank and Trust Company for the purpose of making the improvements. All the above representations are more than merely "dealer's talk." The evidence is abundant to be submitted to the jury to show no intention of performance. It may be termed "futurity fraud."

In 1 Bigelow on Fraud, 484, it is said: "The general rule in regard to promises is that they are without the domain of the law unless they create a contract, breach of which gives to the injured party simply a right of action for damages and not a right to treat the other party as guilty of a fraud. But that proceeds upon the ground that to fail to perform a promise is no indication that there was fraud in the transaction. There may, however, have been fraud in it; and this fraud may have

consisted in making a promise with intent not to perform it. To profess an intent to do or not to do, when the party intends the contrary, is as clear a case of misrepresentation and of fraud as could be made. A promise is a solemn affirmation of intention as a present fact." *Hill v. Gettys,* 135 N. C., at p. 376.

In *Braddy v. Elliott,* 146 N. C., 578, at p. 582, it is said: "If the jury should find, in addition to their findings on the first and second issues, that the defendant fraudulently induced plaintiffs to agree to the exchange by falsely representing and pretending that he would build two suitable dwellings and necessary outhouses on the tract of land, such finding would be ample basis for the decree canceling the entire transaction. . . . The subsequent acts and conduct of a party may be submitted to the jury as some evidence of his original intent and purpose, when they tend to indicate it."

In *Herndon v. Durham,* 161 N. C., p. 650, at p. 556, it is said: "A promise is usually without the domain of the law, unless it creates a contract, but if made when there is no intention of performance, and for the purpose of inducing action by another, it is fraudulent, and may be made the ground of relief." *Abel v. Dworsky,* 195 N. C., 867; *Palmetto Bank and Trust Co. v. Grimsley,* 134 S. C., 493, 51 A. L. R., 42.

Bispham's Equity (9 ed.), sec. 211, says: "The representation must not be an expression of intention merely. A man has no right to rely upon what another says he intends to do, unless, indeed, the expression of intention assumes such a shape that it amounts to a contract, when, of course, the party will be bound by his engagement and for the breach of which the other side has, ordinarily, an adequate remedy at law. But if a promise is made with no intent to perform it, and merely with a fraudulent design to induce action under an erroneous belief, or if a representation amounts to a statement of fact, although dependent upon future action, in either case there is ground for equitable relief." See *Walsh v. Hall,* 66 N. C., 233; *Furst v. Merritt,* 190 N. C., at p. 403; *McNair v. Finance Co., supra,* p. 716-7.

In *May v. Loomis,* 140 N. C., at p. 357, it is held: "In order to rescind, however, the party injured must act promptly and within a reasonable time after the discovery of the fraud, or after he should have discovered it by due diligence; and he is not allowed to rescind in part and affirm in part; he must do one or the other. And, as a general rule, a party is not allowed to rescind where he is not in a position to put the other in *statu quo* by restoring the consideration passed. Furthermore, if, after discovering the fraud, the injured party voluntarily does some act in recognition of the contract, his power to rescind is then at an end. These principles will be found in accord with the authorities. Bishop on Contracts, secs. 679, 688; Beach on Contracts, sec. 812; Page on Con-

tracts, secs. 137, 139; Clark on Contracts, pp. 236, 237; *Trust Co. v. Auten,* 68 Ark., 299; *Parker v. Marquis,* 64 Mo., 38." *McNair v. Finance Co., supra,* at p. 718.

In 6 R. C. L., part sec. 316, at p. 934, it is said: "Fraud is not waived unless there is conduct inconsistent with a purpose to disaffirm the contract after full knowledge of the facts which constitute the fraud, and raise an election whether the defrauded party will go on with the contract, or disaffirm what has been done. But full knowledge of a fraud does not mean that the party defrauded shall have knowledge of all of the evidence tending to prove the fraud. If he has knowledge of the material facts which go to make up the case of deceit as practiced upon him, it is sufficient to make him elect whether he will go on with the contract, or stop short and sue for the loss he has already suffered. If a contract has been procured by fraud, and the person defrauded, with knowledge of the substance of the fraud, elects to affirm the contract, he cannot subsequently, upon discovering new incidents of the same fraud, elect to rescind the contract. Knowledge of the essence of the fraud puts him to his election." *Hawkins v. Carter, ante,* 538.

The evidence was to the effect that the interest payment was made before the discovery of the fraud and plaintiffs are in the position to put the parties in *statu quo.* They offered to reconvey and the judgment requires this to be done.

The next proposition: Did the court err in overruling motion of appellant, Central Bank and Trust Company, trustee, for a directed verdict on the third and fourth issues? We think not.

In *Bank v. Wester,* 188 N. C., at p. 375, it is said: "This matter is so well stated in *Moon v. Simpson,* 170 N. C., 336-7, by *Allen, J.,* that we reproduce it: 'In *Trust Co. v. Bank,* 167 N. C., 261, the Court said: "Our negotiable instrument law is simply the codification of the common law, and under both the statute and the common law the possession of a negotiable instrument by the endorsee, or by a transferee where endorsement is not necessary, imports prima facie that he is the lawful owner and that he acquired it before maturity, for value, in the usual course of business and without notice of any circumstances impeaching its validity. Nothing else appearing, this entitles the holder of a negotiable instrument to maintain an action upon it. By presenting the paper, in case duly endorsed, the plaintiff made out a prima facie case, that is, a case sufficient to justify a verdict for him on the first issue." This prima facie case may be rebutted. The rule is different where it is shown that the title of the person who *negotiated the instrument* is defective (Rev., sec. 2208 (C. S., 3040), and his title is defective if "he obtained the instrument or any signature thereto by fraud, duress or force and fear, or other unlawful means, or for an illegal consideration as amounts to

fraud." Rev., sec. 2204 (C. S., 3036). In such case, when it is shown that the title of the person who negotiated the instrument is defective, or there is evidence of the fact, "it is necessary for a recovery by one claiming to be the holder in due course to show by the greater weight of the evidence that he acquired the title (1) before maturity; (2) in good faith for value; (3) without notice of any infirmity or defect in the title of the person negotiating it." *Mfg. Co. v. Summers,* 143 N. C., 108; *Smathers v. Hotel Co.,* 168 N. C., 69; *Bank v. Fountain,* 148 N. C., 590; *Bank v. Branson,* 165 N. C., 344; *Bank v. Drug Co.,* 166 N. C., 100.'" *Holleman v. Trust Co.,* 185 N. C., 49; *Bank v. Felton,* 188 N. C., 384.

It may be noted that defendant in its defense does not allege that it "had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." The third issue was in conformity with the law and had this requisite.

C. S., 3033, is as follows: "A holder in due course is a holder who has taken the instrument under the following conditions: (1) That the instrument is complete and regular upon its face; (2) that he became the holder of it before it was overdue and without notice that it had been previously dishonored, if such was the fact; (3) that he took it for good faith and value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." *Bank v. Wester, supra.*

These are material facts to be proved by the Central Bank and Trust Company, trustee, by the greater weight of the evidence that it was a holder in due course, when under the facts as appear on the record in this case there was evidence to the effect that the notes were obtained by fraud. The Central Bank and Trust Company's, trustee, evidence was to the effect that it was a holder in due course for the bondholders. The plaintiff's evidence was to the contrary and to the effect that the Central Bank and Trust Company, trustee, did not take the notes in good faith and for value and without notice. What was the combination of facts and circumstances relied on by plaintiffs? (1) The three notes all had reference that each was one of a series secured by deed in trust on real estate bearing even date. (2) The release made by the Central Bank and Trust Company, as trustee, to Mrs. Clark, releasing lot in controversy. The release recites (a) a deed in trust from Stradley Mountains, Inc., dated 1 March, 1926, duly registered, to Central Bank and Trust Company, trustee, to secure certain indebtedness (b) on the same date a deed from Stradley Mountains, Inc., certain land including the lot in controversy to defendant Laurel Park Estates, Inc., duly registered, (c) on the same date deed in trust from Laurel Park Estates, Inc., to Central Bank and Trust Company, trustee, certain lands including the

lot in controversy duly registered. (3) The trust deed made to Central Bank and Trust Company, trustee, contained certain provisions before a release could be made by it, among other things (a) which consideration may be cash (b) or partly cash and partly obligations secured by purchase-money mortgage or deed of trust to Central Bank and Trust Company, as trustee, upon the property so sold to be released. (4) The lot was eight miles from Asheville at the time released with no improvements on it. By the terms of the trust the bank was authorized to release lots therefrom upon being paid "50% of the purchase price of the property so sold, provided in no event should the amount paid for each release be less than a sum equal to $1,000 per acre." (5) The release from the bank to Mrs. Clark recites "in consideration of *a sum of money sufficient* under the terms of each of said deeds of trust to entitle the said party of the second part to a release of the land hereinafter described from the lien and effect of said deed of trust." (6) The attorney of the Laurel Park Estates, Inc., in writing to plaintiff, said: "If however you do not wish to forward the deed of trust and notes to me, mail the same to the Trust Department of the Central Bank and Trust Company, and sign the enclosed letter addressed to that officer, and the deed will be placed there for delivery to you upon receipt of the notes and deed of trust properly signed and executed." (7) John M. Clark also testified that C. W. Brown, the trust officer, told him that he "held them in trust for Laurel Park Estates, Inc., and Stradley Mountain Development Corporation." (8) The Central Bank and Trust Company, trustee, knew by the deed of trust to it, or in the exercise of due care ought to have known, that the development was eight miles from Asheville, on Stradley Mountain. It knew, or in the exercise of due care ought to have known, that these lots with no improvements on them were selling at fabulous prices.

Plaintiff's evidence was to the effect that the lot was released for "a *sum of money sufficient* under the terms of each of said deeds of trust." The trust deed made by the Laurel Park Estates, Inc., to the Central Bank and Trust Company, as trustee, contained a provision authorizing a release *for cash*. The evidence would indicate that the release was for cash, not for notes, and the Central Bank and Trust Company, trustee, for the bondholders, obtained a sum of money sufficient for the release and paid nothing of value for the notes—$3,750. One thousand dollars of the $1,250 cash payment could be inferred was paid it under the trust deeds for the bondholders, the minimum release for an acre being $1,000, and plaintiff purchased only one lot, No. 7, on the plat.

The president of the Laurel Park Estates, Inc., and its attorney and other officers were also directors of Stradley Mountain Development Corporation, and the president of Laurel Park Estates, Inc., its vice-

president.   The evidence would indicate that the Central Bank and Trust Company, as trustee, held the notes in trust for the Laurel Park Estates, Inc.

John M. Clark testified that C. W. Brown, the trust officer, told him that he held the notes in trust for Laurel Park Estates, Inc., and Stradley Mountain Development Corporation.   If this was true, the Central Bank and Trust Company, as trustee, could not hold the notes for the bondholders.   All this was evidence to contradict the testimony of certain officers of the Central Bank and Trust Company, that the notes were held in trust by it for the bondholders.   The probative force was for the jury.

In regard to the duty of a prudent man to make inquiry, see *Mills v. Kemp, ante,* at p. 314.

The law in regard to negotiable instruments is so well stated by *Hoke, J.,* in *Bank v. Fountain,* 148 N. C., at p. 594-5, that we repeat it: "It may be that when fraud is established in procuring the instrument, or there was evidence offered tending to establish it, if the plaintiff, as he is then required to do, should lay before the jury all the evidence available as to the transaction, and it should thereby appear, with no evidence to the contrary and no other fair or reasonable inference permissible, that plaintiff was the purchaser of the instrument in good faith, for value, before maturity and without notice, the court could properly charge the jury if they 'believed the evidence,' or if they 'found the facts to be as testified'—a more approved form of expression—they would render a verdict for plaintiff.   But here, the fraud having been established or having been alleged, and evidence offered to sustain it, the circumstances and bona fides of plaintiff's purchase were the material questions in controversy; and both the issues and the credibility of the evidence offered tending to establish the position of either party in reference to it was for the jury and not for the court.   *S. v. Hill,* 141 N. C., 771; *S. v. Riley,* 113 N. C., 651.   As said by the Court in this last case, the 'plea of not guilty disputes the credibility of the evidence, even when uncontradicted.'   His Honor below, therefore, had no right to say to the jury, on this very material question, 'The prima facie case of plaintiff having been restored by the uncontradicted evidence of the president of the bank, that it acquired the note in the usual course of business, before maturity and without notice of any vice in it'; for this assumes that the statement of the president is to be taken as true, and withdraws that matter from the jury."   In the above case the Court further said: "The trial court was probably misled by the language of the opinion in *Bank v. Burgwyn,* 110 N. C., 273, making a quotation from Daniel on Negotiable Instruments, sec. 819, without adverting to the facts stated in the case on appeal, and it is in reference to such facts

that a decision is to be considered authority, from which it appears that the trial court in that case had submitted the question of the bona fides of plaintiff's purchase to the jury, and had not undertaken to determine it, as was done in the present case. The statement of law contained in this section of Mr. Daniel's valuable work on Negotiable Instruments, sec. 819, has been subjected to adverse comment in the decisions on the subject, which we have adopted as law by our statute, and there is doubt if, since the enactment of this statute, it can be regarded as correctly expressing the rule for trial of causes affected by this section of the statute in reference to the burden of proof." The principle set forth in *Bank v. Fountain, supra,* has been reiterated time and time again by this Court.

Notwithstanding the fact that the exceptions and assignments of error are not in accordance with the rules of this Court, we can find no error in the charge taken as a whole. We find in the judgment of the court below    .

No error.