The evidence was to the effect that plaintiff, Mary Dail Dixon, owned a large body of valuable land near the city of Raleigh, N.C. about three or four hundred yards from the corporate limits, on highway No. 50 — U.S. 1 (Wake Forest Road), the hard-surfaced highway going through the property. On same were a grist mill in operation (a miller in charge) and a brick house with 13 rooms, in which plaintiffs lived. The land was cultivated by tenants.
The plaintiffs made application through the agents in Raleigh, N.C. of the Guaranty Title and Trust Company, of Norfolk, Va., to borrow $15,000 on the property, which loan was approved. The plaintiffs made a deed of trust on the property 5 November, 1926, to secure the amount evidenced by certain bonds payable to bearer and due on 5 November, 1929. These bonds with coupons attached bore 6 per cent interest payable semiannually from date. The bonds, coupons and deed in trust were signed in Raleigh, N.C. but payable at the Trust Company's office in Norfolk, Va. The deed of trust was duly recorded in the register of deeds office for Wake County, N.C. The interest was payable semiannually on the 5th day of May and November in each year. Mary Dail Dixon received from the Guaranty Title and Trust Company the sum of $14,100. She paid $150 to each of the Trust Company agents, a total of $1,200, out of the $15,000 borrowed from the Trust Company, and paid attorney's fees. The interest at 6 per cent was paid on the $15,000 loan until 5 March, 1930. Plaintiffs thought the $900 was deducted for interest in advance until it was later discovered. At the time the loan was made $2,500 of insurance was taken out on the brick house and plaintiffs paid the premium — some $50.63. In 1928 these bonds were purchased by defendants N.M. Osborne and W. B. Newcomb, and plaintiffs became aware of that fact a short time thereafter. When the bonds became due, on 5 November, 1929, plaintiffs were unable to pay same, but up to 5 November, 1929, the interest was paid to the Trust Company. In February, 1930, the property was advertised for sale under the deed of trust. The plaintiffs brought suit to restrain the sale.
At February Term, 1930, a judgment and decree was entered by consent. It was adjudged therein that defendants recover of the plaintiffs the sum of $13,500, with interest from 5 March, 1930. At that time plaintiffs paid $2,500, as will be hereafter set forth. It was ordered, considered and decreed that said judgment was a lien upon the land described in the complaint, and if plaintiffs failed to pay said judgment on or before 1 January, 1931, the commissioners appointed by the court should sell said land, and report their sale to the court for confirmation. Upon plaintiffs' default in the payment of said judgment on 1 January, 1931, the commissioners, after advertisement, sold the land as directed *Page 482 
by the court on 23 February, 1931. This sale was reported to the court and because of defects in the publication of the notices of sale, was not confirmed. At March Term, 1931, there was a decree, directing the commissioners to sell the land at the courthouse door in Wake County on 4 May, 1931, and to report said sale within ten days to the clerk, or to the assistant clerk of the Superior Court of Wake County, for confirmation. On 5 May, 1931, the commissioners filed their report showing that they had sold the land as directed by the court. Plaintiffs filed objections to the confirmation of this sale. These objections were heard by the assistant clerk of the court, who overruled the same, and on 16 May, 1931, confirmed the sale and ordered the commissioner to convey the land to the purchasers. From the order of the assistant clerk of the court, plaintiffs appealed to the judge holding the Superior Court of Wake County.
This Court, in Dixon v. Osborne, 201 N.C. at p. 493, held: "The judge holding the May Term, 1931, of the Superior Court of Wake County heard this action on plaintiffs' appeal from an order of the assistant clerk of said court. After the appeal was dismissed, it was error for the judge to confirm the order of the clerk, and also the sale made by the commissioners on 5 May, 1931. Having dismissed the appeal, the judge was without jurisdiction to further consider the matter. The action is remanded to the Superior Court in order that plaintiffs' appeal may be heard by the judge, and decided on plaintiffs' exceptions to the order of the assistant clerk."
In Dixon v. Bank, 202 N.C. at p. 841, this Court said, in a Per Curiam
opinion: "There is no error in the judgment confirming the sale of the lands described in the complaint. The exceptions of the plaintiffs were considered and overruled. The court found that the sale was fairly conducted in all respects and that the amount bid is a fair price for the lands. The sale was confirmed by the court in its discretion. The only assignment of error is based upon an exception to the judgment. It cannot be sustained. The judgment is affirmed."
J. W. Dixon testified, in part: "At the time we secured this loan, we had insurance, fire insurance, $2,500 on brick house. At that time we paid the premium, $50.00 and some cents. At the time the policy for which we paid premium ended, we were not able to renew the policy and pay the premium. We owed the interest too on the notes. Prior to that time, we knew who had secured these notes that we signed. Dr. Newcomb and Mr. Osborne. When we found we were unable to pay the premium I went to Norfolk to see Dr. Newcomb and Mr. Osborne. . . . Mr. Osborne came to Dr. Newcomb's office and we went into his office and I told the same thing. All three of us were there together. It was about the same conversation I had with Mr. Osborne, and they said *Page 483 
they would pay the premium. They agreed to extend time for paying interest twenty days. I came back to Raleigh. We secured another loan, separate from this loan. Q. Did you turn any money over to Dr. Newcomb and Mr. Osborne? A. To Mr. Smith, their representative. . . . Q. Mr. Dixon, state whether or not there was an itemized list made out as to what should become of the money you turned over to Newcomb and Osborne? A. Yes, sir. Q. Did you see the list? A. Yes, sir, helped make it out. Q. Did that list contain this premium you understood that Newcomb and Osborne had paid? (Objection by defendant, overruled, exception.) A. I saw this list and helped make it out. This list, to my knowledge, contained this statement that this insurance premium should be paid. That accompanied the money that was turned over to the attorneys. I saw that list in the possession of the attorneys. Mr. Paul Smith was their attorney. I saw copy of that list in his file and possession. Prior to that time I had the conversation with Dr. Newcomb and Mr. Osborne in Norfolk, I received bills and statements from Bagwell and Bagwell, insurance agents for the premium. After I had this conversation with them, I did not receive any other statement from Bagwell and Bagwell. I did not know that it had not been paid. I did not know that there was not any insurance on that building at the time. At that time the building had not been destroyed by fire. It was, about six weeks after that, the house was burned, completely destroyed. When I went to Norfolk and talked with Dr. Newcomb and Mr. Osborne, and returned home, I told Mrs. Dixon what had happened. . . . After we took appeal, after the property was sold under this deed of trust and we took an appeal, we gave a bond to staythe execution pending appeal to the Supreme Court. Notwithstanding that they put a deed on record and gave these notices (speaking in reference to the miller and tenants being notified to vacate the land). That bond was accepted by the clerk!
Mary Dail Dixon testified, in part: "I did not know that the $900 which was deducted was not interest. I was never given credit for the $900 on interest. I found out that was not interest just before we started this suit. That is why we started the suit. . . . I realized that this $900 had not been credited to me as interest. It was then that I employed Mr. Jackson to assist me in checking this up. I did pay interest on the $15,000 up until the 15th (5th) of March, 1930. At the time we secured the loan, we purchased a fire insurance policy on the residence, a brick building — 13 rooms. At the end of the period of that fire insurance policy, we were not able to renew it and pay the premium again. Mr. Dixon went to Norfolk to interview the people about what could be done. He told me they were taking care of the fire insurance and we would reimburse them when we paid the interest. He said the fire insurance must be paid and that there was no question about that, *Page 484 
that that must be paid, and they gave us an extension of 20 days in which to make a sale and we were positive of making a sale. . . . After he came home and told me that, I set about trying to secure money on another loan. Prior to his going to Norfolk, and interviewing Dr. Newcomb and Mr. Osborne, I received statements from the insurance company that the premium was due. After he went and came back and told me that he had made arrangements, I did not receive any further statements from the insurance company. I never received notice of cancellation of the insurance policy. After Mr. Dixon came back and told me about the arrangements that he had with Dr. Newcomb and Mr. Osborne, I borrowed some other money, $2,500. We made a list of the things that should be paid, the first, insurance, the taxes, the cost of the court in the former case and the interest due, were items I put down on a paper. I directed my attorneys that this $2,500 should be applied on the items I wrote out on this list. When Mr. Dixon came back from Norfolk and told me that Dr. Newcomb and Mr. Osborne were going to take care of the insurance when I borrowed the money, I designated to attorneys that the premiums should be paid out of the $2,500. Q. Did that list that you made up designate where this money should be put and applied, accompanying the money that was turned over to Dr. Newcomb and Mr. Osborne? A. Yes sir. I saw the list in the courthouse, at the time we paid the money. At that time, the building upon which that policy was issued was standing. It was in good condition. It could have been better. We were living in it. We were comfortable. It was completely destroyed on 20 April by fire. About six weeks after this money was paid over to Dr. Newcomb and Mr. Osborne. After the building was destroyed, I set about to collect the fire insurance policy. Mr. Dixon came in to see Mr. Smith about it to see if he had the check and learned that there was no insurance on the building. I have never collected anything by reason of any fire insurance policy. . . . In the meantime I had borrowed some money from Mr. Shaw, $2,500 for this. . . . When that consent judgment for $13,500 was entered, that gave me almost a year more. When I paid over the $2,500 in March, I had until the first of January, not quite a year. . . . At the time I borrowed the money and directed its delivery to Mr. Newcomb and Mr. Osborne, I directed my attorneys that the money be applied to the list I gave them. The attorneys (Newcomb's and Osborne's) and my attorneys were all present when that money passed. I was in the courthouse when the money was paid and I saw the list again. Mr. Dixon told me that he had seen that list in the possession of the attorneys for Dr. Newcomb and Mr. Osborne, after the fire."
The other necessary facts will be set forth in the opinion. *Page 485 
The plaintiffs alleged in their complaint three causes of action and set forth the questions involved on this appeal, which we abbreviate as follows: (1) Do bonds tainted with usury retain their taint in the hands of third parties? (2) Are the holders of bonds, secured by mortgage liable for not paying premium on fire policy, when the mortgagors delivered them a sum of money accompanied by a list directing its application, which list contained an item for insurance premium which they thought the holders had paid as agreed, until the house burned six weeks later? (3) Are holders of bonds secured by deed of trust liable to mortgagors for taking immediate possession of property sold under foreclosure and bid in by them when appeal was taken to Supreme Court, bond given to stay execution, and Supreme Court reversed the court below?
At the close of plaintiffs' evidence the defendants, N.M. Osborne and W. B. Newcomb, made motion for judgment as in case of nonsuit, C. S., 567, on plaintiffs' first, second and third causes of action. The court below granted the motion. We think this was error, as to the second and third causes of action.
As to the first cause of action: We do not think plaintiffs' contention on this record can be sustained. The present record and the record to this Court on the prior appeals, show that plaintiffs were fully cognizant of the consent judgment and of course was bound to know of the $900 deduction in the original loan. If not at the time of the consent judgment, long before this action was instituted. In fact when the $2,500 was paid, the $15,000 principal of the debt was past due from 5 November, 1929, with interest paid to 5 March, 1930. The plaintiffs were fully aware that the $2,500 payment reduced the principal of the indebtedness to $13,500. Of course this deduction of $900 from the $15,000, original loan does not appeal to a court of law or equity, yet plaintiffs were sui juris and compromised their differences. No fraud or mistake is alleged and they are bound by what was done and acquiesced in. We think the parties are estopped from the record and the principle as to the taint of usury extending to purchasers of the bonds payable to bearer in due course does not arise on this record.
The law enunciated in Ward v. Sugg, 113 N.C. 489, and Bank v. Felton,188 N.C. 384, are not applicable to the facts on this record.
It is said in Ector v. Osborne, 179 N.C. at p. 669: "A borrower is not, however, compelled to plead usury, and as the defense is personal to him it may be waived. . . . (p. 670) `The statutes of usury being *Page 486 
enacted for the benefit of the borrower, he is at liberty to waive his right to claim such benefit and pay his usurious debt, if he sees fit to do so. It is, therefore, held that when the debtor becomes a party to a general settlement of preceding usurious transactions, made fairly and without circumstances of imposition, his recognition and the amount agreed to be due as a new obligation will preclude his setting up the old usury in defense of the new debt. This rule is not held to apply, however, unless it is clear that the debtor has fully accepted the settlement as a just debt separate and distinct from the preceding usurious obligations.' 39 Cyc., 1024. `The $600 thus paid to the plaintiffs became their money, and was in no way involved in the account. Its payment in final settlement of the usurious transaction simply purged it of the taint, or eliminated the usurious feature, and reduced the principal to $4,500. That was the new principal, and bore legal interest.' If, as was held, a compromise and settlement followed by the execution of a release purges the transaction of usury, surely the same effect should be given to a compromise and settlement, in which the usury is eliminated, and which is approved by a judgment of the court."
It will be noted that this settlement and compromise judgment was made by plaintiffs not with the Guaranty Title and Trust Company, from whom they borrowed the money, but with Osborne and Newcomb, purchasers, in due course. The bonds were made to bearer. See "Negotiable Instruments" C. S., 2982(4); C. S., 3010, 3033, 3038, and 3040. The usury statute 2306, should be strictly construed and has been by this Court. Ripple v. Mortgage Co.,193 N.C. 422; Pugh v. Scarboro, 200 N.C. 59; Trust Co. v. Redwine,ante, 125. Usury must be pleaded. Berger v. Stevens, 197 N.C. at p. 237.
There is nothing more obnoxious than usury, it has been disapproved by stringent statutory provisions, by the General Assembly of this State from early times. The Mosaic Law condemned it. In the Pugh case, supra, at p. 64: "The humanities of all civilized nations has condemned usury, a species of ingenious oppression, especially in this day."
In the Ripple case, supra, at p. 428, the following charge of the court below was sustained: "`Now, gentlemen of the jury, if the place of payment was specified as in the State of Maryland, for the purpose of avoiding the usury laws of North Carolina, and if it were a scheme or method to avoid the usury laws of North Carolina, and that was the reason for the place of payment being provided in Maryland, then your answer to the second issue would be `No'; that they were not to be performed in Maryland, because if providing the place of payment as Maryland was a scheme to evade and whip around the usury laws of North Carolina, and was not done in good faith, then the place of payment, so far as the law is concerned, would not be in Maryland.'" *Page 487 
 As to the second cause of action: The evidence of plaintiffs was to the effect that insurance had been taken out on the property (the brick house) and the premium paid for by plaintiffs. It may be inferred to protect the bondholders with usual loss clause, otherwise in case of fire the insurance could not be collected. The insurance agents notified plaintiffs that another premium was due. The plaintiff J. W. Dixon had an agreement with defendants Osborne and Newcomb that they would advance the premium. They lulled plaintiffs into security by the promise and did not pay the premium. Then again, when $2,500 was paid directions were specifically made by plaintiffs that out of the amount, the insurance premium was to be paid. The exception in the record as to this question in relation to this matter cannot be sustained. If the agent or agents of Osborne and Newcomb could compromise in the action the claim against plaintiffs and which was ratified by Osborne and Newcomb, we see no good reason why the agent or agents did not have authority to accept the money, part of which was to pay the premium as designated by plaintiffs. The defendants Osborne and Newcomb, on the facts and circumstances of this case, cannot plead nudumpactum nor lack of authority on the part of their agent or agents.
The latter matter has been fully set forth in Maxwell v. DistributingCo., ante, 309, and need not be further discussed. It is well settled that the debtor has the right to direct the application of payment when he owes more than one debt. Stone v. Rich, 160 N.C. 161; Supply Co. v. PlumbingCo., 195 N.C. at p. 633.
Without going further into the evidence as there will be a new trial, it is sufficient to say that the competent evidence on this aspect was plenary to have been submitted to a jury.
As to the third cause of action: If the evidence of plaintiffs did not show that they gave bond to stay execution we do not think that plaintiffs' contention could be sustained. No increased bid was placed on the land. The very question was decided in Parker v. Dickinson, 196 N.C. at p. 243: "Does confirmation of a sale or of an actual partition take effect upon the date of confirmation or at the date of the sale? Until a judicial sale has been confirmed the purchaser is a mere preferred proposer. Confirmation is an act of consent and approval which the court gives to the sale, and, for all practical purposes the court is the vendor in such cases, and within the limitation prescribed by law, may give or withhold its consent in its discretion. Harrell v. Blythe, 140 N.C. 415, 53 S.E. 232. However, when the transaction is completed by confirmation, and thereupon title is conveyed to the purchaser, confirmation relates back to the day of the sale and the purchaser receives his title as of that time. Farmer v. Daniel,82 N.C. 152; McArtan *Page 488 v. McLaughlin, 88 N.C. 391; Vass v. Arrington, 89 N.C. 10; Joyner v.Futrell, 136 N.C. 301, 48 S.E. 649."
Vass v. Arrington, supra, was an action brought to foreclose a mortgage as in the present, the Court said, at p. 14: "Where land is sold under decree of court, the purchaser acquires no independent right. He is regarded as a mere proposer until confirmation. Attorney-General v. RoanokeNavigation Co., supra (86 N.C. 408). But when confirmation is made, the bargain is then complete, and it relates back to the day of sale. Rorer on Jud. Sales, sec. 122."
The position here taken in no way conflicts with what was said inCollins v. Bass, 198 N.C. 99, where it was held that a purchaser at a foreclosure sale was entitled to possession as against a tenant of the mortgagor holding under a lease executed after the maturity of the mortgage indebtedness (see change — Public Laws, 1931, chap. 173), nor with the holding in Mercer v. Bullock, 191 N.C. 216, to the effect that the mortgagor is entitled to collect all rents due at the time of foreclosure, and the purchaser such as fall due thereafter.
The plaintiff J. W. Dixon testified "We gave a bond to stay the execution pending appeal to the Supreme Court." The court below sustained defendants' motion for judgment as in case of nonsuit on this third cause of action, and in this we think there was error. An appeal bond can be given to stay execution in matters of this kind. From plaintiffs' testimony it would indicate that plaintiffs gave bond in accordance with the statute. C. S., 653, 654, 655. See, also, C. S., 657. Pruett v. Power Co.,167 N.C. 598. The case was ably argued by Dean N.Y. Gulley, the Gamaliel of the law.
Plaintiffs' testimony was to the effect that Osborne and Newcomb "notified all tenants to vacate and notified me too. . . . We did not collect any rent from them after that."
On the first cause of action, the judgment is affirmed, on the second and third causes of action it is reversed.
Affirmed in part and reversed in part.