EDNA CROUSE v. O. M. VERNON AND FIRST STATE BANK & TRUST COMPANY OF MOUNT HOLLY, N. C., AND C. B. FALLS, JR., TRUSTEE.

(Filed 3 May, 1950.)

**1. Evidence § 22½ —**

Where defendant, on cross-examination of plaintiff, has elicited matter irrelevant to the issue, but calculated to impeach plaintiff as morally unfit to be believed as a witness, the court has discretionary power to permit plaintiff on re-direct examination to testify in explanation or repair of the matter elicited on cross-examination, and defendant cannot complain if it also incidentally appeals to the sympathy of the jury.

**2. Evidence § 22—**

The court has discretionary power to limit the cross-examination of a witness for the purpose of impeaching her character in regard to matters irrelevant to the issue and unrelated to her testimony in chief.

**3. Evidence § 46d—**

In order to testify as to the value of property before and after the damage in suit, it is not required that the witness should have seen the property immediately before and after the injury, reasonable nearness under the circumstances being sufficient. In the present case, testimony

disclosing that the witness saw the house a few days before the fire and its remains two or three days after the fire, *held* to render the witness' testimony of comparative values competent.

**4. Trial § 22a—**

On motion to nonsuit, plaintiff's evidence is taken as true.

**5. Insurance § 16—**

Plaintiff's testimony to the effect that the mortgagee promised to insure the house under construction for a definite sum for the protection of both mortgagor and mortgagee, and to deduct the premiums from the mortgagor's account, *is held* sufficient to be submitted to the jury on the issue of the existence of a contract to insure in the amount stated for mortgagor's benefit.

**6. Same—**

An agreement by the mortgagee to procure insurance for the benefit of mortgagor and mortgagee will not be held void for indefiniteness for its failure to specify a date within which the insurance should become in force, since in such instance the insurance must be placed in a reasonable time, as implied by the nature and purpose of the contract.

**7. Same—**

In an action for damages for breach of contract to procure insurance where no time is specified in the contract for performance, the failure of the court to instruct the jury on the question of reasonable time for performance will not be held for error in the absence of a special request when it appears that more than two months elapsed between the agreement and the fire causing the damage, especially where defendants defend solely upon the theory that there was no contract to insure.

**8. Damages § 13a—**

An instruction on the issue of damages will not be held for error in using the terms "cash value" and "market value" as interchangeable terms, and the court is not required to explain the meaning of the rule without a special request.

**9. Insurance § 16: Contracts § 22—**

Where a defendant categorically admits nonperformance, and bases his defense solely upon the denial of the existence of the contract, he may not complain of the failure of the court to charge that the burden of proving nonperformance was on plaintiff.

DEFENDANT's appeal from *Gwyn, J.,* January Civil Term, 1950, GASTON Superior Court.

The plaintiff sued to recover damages for breach of contract to insure a building of plaintiff, constructed on a lot in or near Mount Holly, N. C., in which town the corporate defendant was doing a banking business, and, allegedly, conducting an insurance agency, through its president and codefendant, O. M. Vernon. The defendant Falls, Jr., was trustee in a

deed of trust executed by plaintiff to the Bank to secure a note in the sum of $2,500 given by plaintiff for a loan extended to her, to be used in financing, in part, the construction of the building.

The plaintiff alleges that at the time the loan was made to her the defendant bank and its codefendant Vernon contracted with her to secure adequate and timely insurance on the building in the sum of $4,500, and, through gross carelessness and neglect failed to do so; that the structure was destroyed by fire, or greatly damaged in excess of the designated amount of insurance which defendants agreed to procure, and that she was damaged in that amount.

Plaintiff further alleges that at the time of the loss by fire plaintiff had withdrawn from the fund credited to her at defendant bank the sum of $1,535.06, leaving a balance of $964.94, which she endeavored to draw out, but the Bank refused to honor her check. That they still retain and refuse to return to her the note and deed of trust extended by Mrs. Raymond Bagley on her Mecklenburg property, constituting a second lien thereupon, deposit of which had been made as additional security for the $2,500 loan.

The defendants, in separate answers, denied the principal allegations of the complaint respecting the alleged agreement to procure insurance, and set up, each, further defenses: The defendant Vernon alleged that he had "explained to the plaintiff that when she had completed her building for her to come to him and that he would be glad to write Fire Insurance upon it. That the plaintiff agreed to this and knew that she did not have any Fire Insurance and knew that she had not paid for any Fire Insurance. That thereafter this defendant did not see the plaintiff again until in April, 1949, and when she called and stated she had had a fire." The Bank alleged that it was not empowered to write fire insurance and "never authorized its President or anyone else to represent to the plaintiff or anyone else any representations as to securing fire insurance and that any such representations, if made, which this defendant denies, were without the authority of this defendant . . ."

Plaintiff testified substantially as follows:

That she went to see O. M. Vernon and discussed with him a loan on her house; told him what security she had, and that the lot on which she was building had been bought from him. After this information he told her he thought he could let her have the money to finish her house; to bring him the deeds to the lot and the note and deed of trust on the Charlotte property and he would have it checked. This was around the 20th or 22nd of January.

There was a discussion of the insurance policy. Plaintiff went to the Bank three times and the matter of insurance was discussed. The first time Vernon told her she would have to have insurance on the house.

She replied : "Insurance on a block house?" And he said, "Yes Ma'am. You already have some timbers in there and there will be more timbers later on and you will need insurance and will have to have it."

The second time they talked about insurance, "he said he would take the papers over to Charlotte and have them checked to see if they were all right, and he would send the man over to have the house appraised and he would write out the insurance. He asked what the house would cost, and I told him I was hoping to get by with $4,500 with my free labor. The first and second time both he said that I would have to have the insurance to get the loan. I said, 'Well, if I have to have it, I have to have it. Go ahead and write it.' "

"When he asked me what the house was going to cost me, I told him I was hoping to get by with $4,500. He said, 'Well, we want that much insurance for your protection and mine.' "

About February 1, when she signed the note for the loan, "there was a reference to a fire insurance policy, and it was to cover the property described in the deed of trust. The last time I was there he was in a hurry, and I asked him if he had had the house appraised and had wrote the insurance yet. He said, 'No, I have been busy, and I have not got it just yet, but I will do it.' I opened my bag and was going to pay him. He said it would cost me about $15.00 to have the house appraised. I meant to pay the insurance and appraisal of the house. He said, 'You go ahead and finish with your house, and I will write this out and take it out of what you have in the bank.' He said, 'You attend to that part over there and I will attend to this.' That was all that was said, as he was in a hurry to go to Charlotte, and we did not sit down. We just walked out. He gave me a check book and said, 'Here's your check book. Check on your money as you need it.' "

The house was burned down April 9. (Witness described conditions after the fire) :

> "On Wednesday after the fire I talked to Mr. Vernon at his home about 8 :45. They said he was out of town until that day. I asked him about my insurance. He said he had it, but he didn't know exactly how much he had written out. I said, 'Well, my house has burned to the ground,' and he stood there a minute and said, 'Mrs. Crouse, I don't believe that I have written the insurance.' After that I talked to Mr. Vernon at the bank. Before I told him the house was burned, he said he would look at the bank and see about the insurance. When I went down there, he went in, and that fellow right in the front of the bank and he said a word or two and came back and sat down and said, 'Mrs. Crouse, I am sorry you don't have any insurance.' "

CROUSE *v.* VERNON.

At the time the house had burned plaintiff had expended in its construction $5,200 or $5,300.

On cross-examination plaintiff described the condition of the house when she went to see Mr. Vernon about the loan, stating that most of the building was up. She further testified:

"Up until that time I didn't have any insurance on the construction of the building. There wasn't anything but the cement block walls up until the week before I went to borrow the money. I didn't have any insurance at the time I got the loan. I had intended insuring the building. I wanted it. I said, 'What, a cement block house.' I didn't mean that a cement block house ought not to be insured. My money was scarce at that time, and I never dreamed of anybody being low-down enough to burn my house down as they did. That is the reason I didn't give it a thought. I didn't think there was anybody living mean enough to burn a widow woman's house down. I know the fire was set. I thought I had insurance. I thought Mr. Vernon would write the insurance as he had promised to do. I hadn't thought of insurance until I went to Mr. Vernon and he told me I would have to have it. I hadn't thought of it until then. I hadn't thought of anything happening to it; if I had, I would have had insurance, and I would have known that I had it."

\*    \*    \*

"The only purpose I had when I went to see Mr. Vernon was to borrow $2,500, and had no other purpose whatever and never thought about insurance until he mentioned it, and then I seen that I should have needed it."

On questions asked by the defendants' counsel the plaintiff gave an account of her family, stating the number of her daughters, and ages of the children, and the environment in which she lived in Charlotte, and whether she kept a rough house.

"I wouldn't say that I had a pretty rough house there. My daughter Loreen was there and my youngest daughter, Joyce, when I lived there. She was 14 years old. I deny that at practically all times of day and night men were coming in and out of my house, drinking and carousing. I do not know that conditions were so rough that neighbors had to call the police time and again. That didn't happen while I was at home. Once in a while drinking was going on there. That was my daughter Loreen. Police weren't there when I was there. I won't swear they were never there. My daughter was the one who called them unless she lied to me."

"Q. I'll ask you if conditions weren't so bad there that the Welfare Department made you take Joyce away from there?"

"I don't think I am responsible for what my married children do in this case. It is not my will for my children to go wrong. Not many mothers can correct children after they are married and leave home."

"Q. You testified for them when Hall was suing Stafford when you were in Stafford's house and your son-in-law was suing Stafford because he had separated your daughter from Hall?"

Objection—sustained—exception.

"I was here at that trial and testified for Stafford in that suit."

"Q. You heard neighbor after neighbor testify that this man Stafford that you have been living with, while your son-in-law was away from home, would go there and spend nearly every morning with your daughter?"

Objection—sustained—exception.

On re-direct examination the following occurred:

"Q. Did you work during the time your husband was living?"
Objection—overruled—exception.
"A. Yes.
"Q. Why did you work?"
Objection—overruled—exception.
"A. He was sick and not able to work. He lacked from January to March being sick for twenty years, and I had to work to make a living for us."

Ethel Stafford testified that she was present on one of these occasions when plaintiff was negotiating the loan and when the subject of insurance was discussed, in corroboration of plaintiff's testimony.

Charles Hoyle, for plaintiff, testified as to work on the house, details of construction, and settlements made with him; identifying the protested check for $762 given him by plaintiff in settlement.

Alphonso Beam, for the plaintiff, testified that he did cement work on the house, from September to the following February. He testified that he had been in the building business for 32 years; had sold two or three houses; had five at present that he had built. He testified that at the time he quit construction in February the house, exclusive of the land, had a reasonable market value of $2,800 to $3,000.

Over defendants' objection he testified that he had seen the house before it was burned and afterward, and that its reasonable market value before burning was $4,500 to $5,000 and after burning from $500 to $600.

Mrs. Crouse told witness that she had insurance with the Mount Holly Bank.

Plaintiff offered several witnesses who testified to her good character.

Plaintiff rested. Defendants demurred to the evidence and moved for judgment of nonsuit, which was declined. Defendants excepted.

The defendant Vernon testified as to details of the security plaintiff offered for the $2,500 loan, and an explanation of the items charged against the proceeds. He testified that no mention of insurance on the house she was constructing was made on Mrs. Crouse's second visit. The insurance discussed with her was on the Charlotte property, to know if there was provision made in the second deed of trust, on the strength of which he was making the loan, for fire insurance. The deed was at the time given him for inspection.

He testified that his security was based on the Charlotte papers, not the Crouse propery; he did not at any time agree to procure fire insurance on the Mount Holly property; but that at her last visit, after procuring the loan, he suggested to her as she was leaving the bank, that when the house was finished he "would be glad to go up, have it appraised, and write you some fire insurance on it." He testified that he had never written a builder's risk insurance policy in his life. The first time he heard of the fire was two or three days after it occurred.

On cross-examination defendant stated that he was qualified to write insurance in half a dozen companies, and would have written insurance on Mrs. Crouse's house if she had had one and requested it. That he had, financed 60 or 75 houses on which he required builder's risk insurance. "I have been writing insurance more than 20 years, between 20 and 25 years. My board of directors knows that I customarily write insurance of this sort and that I customarily require insurance on real estate loans."

W. H. Crane, witness for defendant, testified that he made out the deposit slip for the loan and heard Mr. Vernon say when he handed it to her, "Now, Mrs. Crouse, when your house is finished let me know. I will be glad to come out and look at it and write you some fire insurance."

Clyde Davis, witness for defendant, testified to the same effect.

Fred McIntosh testified for defendant, giving an estimate of replacement value.

At the conclusion of all the evidence the defendants renewed their demurrer thereto and moved for judgment of nonsuit, which was declined. Defendants excepted.

Issues were submitted to the jury, and after instructions thereupon by the court, the issues were answered as follows:

"1. Did the plaintiff and the defendant Vernon at the time the plaintiff obtained the aforesaid $2,500 loan enter into an agreement

by the terms of which the defendant Vernon agreed to procure and have issued to the plaintiff a fire insurance policy in the amount of $4,500 covering the house being built on the plaintiff's property in Vernon's Park during the construction thereof, as alleged in the complaint?

"Answer: Yes.

"2. Did the defendant Vernon fail to procure such insurance coverage and thereby violate the agreement with the plaintiff, as alleged in the complaint?

"Answer: Yes.

"3. What damage, if any, is the plaintiff entitled to recover?"

"Answer: $4,000.00."

The defendants moved to set aside the verdict for errors of law committed on the trial. The motion was declined and defendants excepted.

In the ensuing judgment, after adjudging recovery in accordance with the issues, Judge Gwyn provided:

"It is further ordered, adjudged that any and all amounts due the First State Bank and Trust Company upon the note and deed of trust executed by the plaintiff to C. B. Falls, Trustee for the defendant First State Bank and Trust Company, referred to in the complaint shall constitute an offset to this judgment and shall be credited upon the amount which the plaintiff recovers by this judgment."

From the judgment defendants appealed, assigning errors.

*J. Mack Holland, Jr., and James Mullen for plaintiff, appellee.*

*S. B. Dolley and Garland & Garland for defendant appellants O. M. Vernon and First State Bank & Trust Company of Mount Holly, N. C.*

SEAWELL, J. It is often not advisable, and sometimes impossible to set out in detail all the challenges made to the validity of a trial, with accompanying explanatory matter, in the space allotted for statement of the case and the opinion. All these objections have, of course, received due consideration; but we are compelled to confine discussion to those which have been advanced as disclosing more outstanding prejudicial error. Those to which more importance seems to have been given are discussed.

1. *Objection to the admission and exclusion of evidence.*

An exception is directed to the admission of plaintiff's testimony that because of her husband's illness she had been compelled to work, (she had

previously stated at a cotton mill in Charlotte), on the ground that this was irrelevant to the issue and constituted an appeal to the sympathy of the jury, citing *Shepherd v. Lumber Co.*, 166 N.C. 130, 81 S.E. 1064; *Dellinger v. Building Co.*, 187 N.C. 845, 123 S.E. 78; *S. v. Page*, 215 N.C. 333, 1 S.E. 2d 887; *S. v. Warren*, 227 N.C. 380, 42 S.E. 2d 350.

This testimony was let in on direct examination after, on the preceding cross-examination, defendants' counsel had sought to impeach the plaintiff witness, and attack her credibility by questions tending to show that her house, in which there were several daughters, was so disorderly and badly kept as to excite the complaint of neighbors and cause police visitation.

Some of these questions elicited answers apparently unsatisfactory to counsel and these questions persisted after the court sustained objections.

Notwithstanding the liberality extended to cross-examination, counsel asking impeaching questions as to matters he would not be permitted to prove independently is bound by the answers; and sometimes damaging implications often attend the simple asking of questions where no answer is allowed. In the particular case cross-examination was of such a character as to invite the testimony given by the witness on re-direct. These matters generally are within the discretion of the court; *S. v. Warren, supra;* but it would be a strange exercise of discretion which permitted a cross-examination irrelevant to the issue but calculated to impeach the witness as morally unfit to be believed, and deny her the right to explain or repair the attempted damage. *S. v. Warren, supra.* The defendant's counsel opened the door and if the return sally was germane to the attack, counsel cannot complain if it incidentally appealed to sympathy.

Some of the questions of this character asked the plaintiff by counsel for the defendants were excluded and objection was made by the defendants. "(1) Weren't conditions so bad there (in your home in Charlotte) that the Welfare Department made you take Joyce away from there?" (2) "You testified for them when Hall was suing Stafford because he had separated your daughter from Hall?" (3) "You heard neighbor after neighbor testify that Stafford . . . would go there and spend nearly every morning with your daughter?"

The right to cross-examine witnesses on all matters brought out in the examination in chief is absolute. But the cross-examination of the character here disclosed is within the reasonable discretion of the court and we think the trial judge held to the balance fairly within the discretion permitted him. *S. v. Coleman,* 215 N.C. 716, 2 S.E. 2d 865.

An objection has been made to the testimony of witnesses directed to the measure of damages caused by the fire: That they were not qualified to express an opinion because they did not testify that they saw the premises *immediately* before and immediately after the fire.

We are of the opinion that the evidence disclosed to the jury that both views, "before and after," were taken with sufficient nearness to the burning as to make the evidence competent; Beam saw the house a few days before the fire, and what remained of it two or three days after it. "Immediately," in the strict sense, is not essential. It is a question of reasonable nearness. *Grubbs v. Ins. Co.,* 108 N.C. 472, 13 S.E. 236; *Hart v. R. R.,* 144 N.C. 91, 56 S.E. 559; *Newsom v. Cothrane,* 185 N.C. 161, 116 S.E. 415; *Wyatt v. R. R.,* 156 N.C. 307, 72 S.E. 383.

2. *Demurrer to the evidence and motion for nonsuit.*

The theory on which the motion to nonsuit is pressed appears to be that the evidence as to the terms of the purported contract, as testified to by the plaintiff, renders it too vague to constitute a completed contract, breach of which would give rise to a cause of action. The main defect criticized as fatal is that it does not set a definite date for its performance; that Mrs. Crouse had no purpose in mind in obtaining it except in view of the loan for which she applied; that she had paid for no insurance; and if there had been an agreement defendant would have been allowed a reasonable time to write or procure the insurance.

In presenting these views in the brief appellants resort in part to defendants' evidence in support of their position. But looking to the plaintiff's evidence in its most favorable light, there is ample evidence tending to show that defendant Vernon entered into an agreement to write or procure the insurance upon the house in question and in a definite amount; that plaintiff offered to pay for it and he agreed to take it out of the amount of her loan and would not permit her to do so; that she inquired about the insurance with some diligence, and at one time, because of the hurry of Vernon to get away to Charlotte, he told her he had not attended to it but would, with assurance that if she attended to the construction of the house he would attend to the insurance. She was led to believe that the house really was insured both for her own benefit and that of the bank.

The contract to write or procure insurance on plaintiff's building will not be rejected for vagueness because it fixed no date for performance of the time within which the insurance should become in force. We do not understand that this is usual in a contract of this nature. Under plaintiff's evidence, (which on demurrer must be taken as true), the contract was sufficiently definite. Under it the defendant was charged with good faith and due care in its performance. Couch on Insurance, Sec. 1215; Appleman, Insurance Law and Practice, sec. 2261. This *per se* requires that the insurance must be placed in a reasonable time, as implied by the nature and purpose of the contract. Appleman, *supra,* p. 113, sec. 2261; and in an action for its breach this may be a matter for

the jury, or, in some situations where the delay is *per se* unreasonable, a matter of law for the court; but its omission will not vitiate the contract.

On the evidence the defendant is not entitled to limit the purpose of the insurance to the necessities of the loan and thus make its procurement optional with the mortgagee. The mortgagee may, and according to the evidence did, insure for his own benefit and also for the benefit of the mortgagor, Appleman, Insurance, Sec. 2264; and the sum named in the proposed agreement corroborates the plaintiff in this respect since it far exceeded the loan.

Referring again to the evidence, the defendants cannot avail themselves of the defense that plaintiff did not pay the premium on the policy, since she offered to pay it and defendant agreed to deduct it from her account. Strikingly apt in this connection is *Dixon v. Osborne,* 204 N.C. 480, (Loc. cit. 487), 168 S.E. 683, in which it is said:

> "The plaintiff J. W. Dixon had an agreement with defendants Osborne and Newcomb that they would advance the premium. They lulled plaintiffs into security by the promise and did not pay the premium. Then again, when $2,500 was paid directions were specifically made by plaintiffs that out of the amount, the insurance premium was to be paid. The exception in the record as to this question in relation to this matter cannot be sustained."

See cases *supra.*

The demurrer to the evidence was properly overruled.

3. *Instructions to the jury.* The defendants contend that the trial judge should have given the jury an instruction on the matter of reasonable time for the performance of the contract. There was no request for such an instruction. We doubt whether on the record presented the defendants would be entitled to such an instruction at all. They deny the contract *in toto* and tried the case upon that theory; and such instruction would have been hypothetical. The defendant Vernon agreed about February 1st to place the insurance, and the fire did not occur until the following April 9th. Under the evidence we are of the opinion that the court was not required to give the instruction as a matter of legal duty without special request on the part of the defendant. *Penn v. Standard Life Ins. Co.,* 160 N.C. 399, 76 S.E. 262; *Livingston v. Investment Co.,* 219 N.C. 416, 14 S.E. 2d 489.

We find no error in the instruction given the jury on the measure of damages. It was not inconsistent to refer to "cash value" and "market value" as interchangeable terms. Much hammering of this subject has not shaped any better way of arriving at "cash value" of property (such as does not inherently fix its own value) than by applying the rule of market value.

The rule has become so familiar in popular and legal use that it needs no preliminary schooling of a witness to enable him to apply it, any more than it does a jury to enable them to understand it. The court was not required to go into an explanation of the meaning of the rule without special request.

The instruction limiting recovery to the cost of replacement and to the amount of insurance agreed upon was not unfavorable to the defendants and, therefore, they were not prejudiced by it.

It is urged that there is reversible error in the failure of the judge to formally charge the jury that the burden of the second issue rested upon the plaintiff. To give such an instruction the court must ignore the theory upon which the case was tried, and the categorical admissions of the defendant Vernon in the evidence that no insurance had been procured or written by him. This left no evidence in that respect to be weighed or determined by the jury.

In a civil action, issues, in the form of questions, are addressed to the jury to aid them in consideration of the evidence and determination of the truth of the matter with which the issues are concerned. They are framed on both the pleadings and the evidence; *Allison v. Steele,* 220 N.C. 318, 17 S.E. 2d 33; *Brown v. Daniel,* 219 N.C. 349, 13 S.E. 2d 623; and when in the evidence and by his own admission the defendant has given the answer, he cannot complain that his own testimony was not submitted to a jury test.

The jury having found in answer to the first issue that the defendants entered into a valid contract to procure the insurance, and Vernon having admitted its nonperformance,—to ascertain which was the only function of the second issue,—the instruction given the jury was logical and free from error. McIntosh, North Carolina Practice and Procedure, 632; 53 Am. Jur., 267; *Speas v. Merchants Bank & Trust Co.,* 188 N.C. 524, 125 S.E. 398.

Nonperformance of a valid contract is a breach thereof regardless of whether it occurs deliberately or through forgetfulness or neglect, unless the person charged, (in this case the defendant), shows some valid reason which may excuse the nonperformance; and the burden of doing so rests upon him.

All the parties to this action stipulated that any liability of the defendant Vernon was that of the corporate defendant, for whom, it is stipulated, he was acting.

On these considerations we are unable to interfere with the result of the trial. We find

No error.